UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLIE INGRATTA,

       Plaintiff,

v.

TIFFANY EASLEY and ROSIE
MACKENZIE, Officers of United
States Custom and Border Protection,
in their individual capacities,

       Defendants.
_____/

Case No. 2:12-cv-11104
Hon. Bernard A. Friedman
Mag. Judge Mona K. Majzoub

## TRIAL BRIEF OF DEFENDANTS TIFFANY EASLEY AND ROSIE MACKENZIE

Defendants Tiffany Easley and Rosie MacKenzie, by and through their attorneys, Barbara L. McQuade, United States Attorney for the Eastern District of Michigan, Derri T. Thomas, Assistant United States Attorney, and Zak Toomey, Assistant United States Attorney, present the following trial brief.

## INTRODUCTION

This lawsuit arises from a patdown search of plaintiff Leslie Ingratta (Ingratta) on January 30, 2011, when she attempted to cross from Canada into the United States via the Detroit/Windsor tunnel. Ingratta, a Canadian citizen, brings this suit against Officers Tiffany Easley (Easley) and Rosie MacKenzie (MacKenzie) of the United States Customs and Border Protection (CBP), for

violation of her Fourth Amendment rights under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). (Dkt. No. 4, First Amended Complaint and Jury Demand).

## PLAINTIFF'S CLAIMS

Ingratta claims that Officers Easley and MacKenzie violated her Fourth Amendment rights by unlawfully detaining her and conducting a non-routine patdown search of her person at the border. She alleges that the patdown search was non-routine because it was unnecessarily and improperly physically invasive. She alleges specifically that MacKenzie groped and fondled Ingratta's bare breasts, grabbed her buttocks, and rubbed her clitoris in such a manner that Ingratta's tampon was pulled out, while Easley watched and failed to intervene. (Dkt. No. 44, Joint Final Pretrial Order, p. 2.)

## DEFENDANTS' DEFENSES TO PLAINTIFF'S CLAIMS

The defendants concede that Officer MacKenzie conducted a patdown search of Ingratta in an office and that Officer Easley witnessed the patdown. They deny, however, that the patdown search was non-routine.

The defendants deny that the patdown search was unnecessarily and improperly physically invasive. They further deny that Officer MacKenzie groped and fondled Ingratta's bare breasts, grabbed her buttocks, or rubbed her clitoris in such a manner that Ingratta's tampon was pulled out. Officer MacKenzie

conducted the patdown of Ingratta in accordance with CBP policies and training. This involved patting down Ingratta's entire body over her clothing, including the breast and groin areas. A standard patdown search of a female includes pressing upon the female's clothing in the areas of the groin and external genitalia. It also includes pulling on and shaking, over her clothing, the female's brassiere, in order to dislodge anything that may be hidden there.

Because Officer MacKenzie conducted the patdown search of Ingratta in an appropriate manner, over her clothing, without groping or fondling her breasts or groin, the patdown search was routine and did not violate Ingratta's Fourth Amendment rights. Alternatively, if the manner in which Officer MacKenzie conducted the patdown search did violate Ingratta's Fourth Amendment rights, it did not violate a Fourth Amendment right that is clearly established, and thus Officers Easley and MacKenzie are shielded from this claim by qualified immunity.

## ROUTINE BORDER SEARCHES

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ." The standard for determining the reasonableness of a search at an international border is different than the standard in the interior of the United States. Although a person presenting himself or herself at the border for admission is "entitled to be free from unreasonable

search and seizure[], . . . the expectation of privacy [is] less at the border than in the interior . . . and the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *United States v. Montoya de Hernandez,* 473 U.S. 531, 539-40 (1985).

With respect to searches at the nation's borders, routine searches are presumed to be reasonable under the Fourth Amendment. *United States v. Ramsey,* 431 U.S. 606, 616 (1977). Routine searches do not require reasonable suspicion, probable cause, or a warrant. *Montoya de Hernandez,* 473 U.S. at 538; *Ramsey,* 431 U.S. at 616-619. "[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Ramsey,* 431 U.S. at 616.

## STOPS AND DETENTIONS AT THE BORDER

As a sovereign state, the United States has the right to "protect itself by stopping and examining persons and property crossing into this country." *Ramsey,* 431 U.S. at 616. All persons seeking entry into the United States are subject to search and detention by CBP officers. *Tabbaa v. Chertoff,* 509 F.3d 89, 96 (2nd Cir. 2007). *See also* 19 U.S.C. § 1582 ("[A]ll persons coming into the United States from foreign countries shall be liable to detention and search by authorized

officers or agents of the Government under [CBP regulations]."); 19 U.S.C. § 1433€ (providing that after arriving in the United States, a vehicle may "depart from the . . . place . . . of arrival" only "in accordance with regulations prescribed by the Secretary [of Homeland Security]"; 8 U.S.C. §1225(b) (providing that the alien "shall be detained" unless he or she appears to the examining immigration officer to be "clearly and beyond a doubt entitled" to enter).

Courts have recognized the government's authority at the border to question travelers at length and conduct wide-ranging, suspicion-less searches of travelers, their vehicles, and their luggage and private effects. *See, e.g., United States v. Flores-Montano,* 541 U.S. 149, 155-56 (2004) (concluding that the removal, disassembly, and reassembly of a vehicle's gas tank as part of a border inspection was routine and required no suspicion); *Tabbaa,* 509 F.3d at 94-95.

An "alien" is defined by the Immigration and Nationality Act (INA) as "any person a citizen or national of the United States." 8 U.S.C. § 1101(a)91). Every alien who applies for admission to the United States is presumed to be an immigrant until he or she establishes to the satisfaction of the inspecting or reviewing officers that he or she is entitled to non-immigrant status. 8 U.S.C. § 1184(b). Any person applying for admission to the United States has the burden to prove that he or she is not inadmissible under the Act, 8 U.S.C. § 1361, and that he or she is "clearly and beyond a doubt entitled to be admitted to the United States

5

and is not inadmissible." *See* 8 C.F.R. § 1240.8(b). An alien seeking admission to the United States must present whatever documents are required and establish his or her entitlement to enter the United States to the satisfaction of the inspecting CBP officer. 8 C.F.R. § 235.1(f)(1).

CBP, as a matter of standard operating procedure, may refer individuals for secondary inspections. *Tabbaa,* 509 F.3d at 96. Border detentions of up to six hours are considered routine. *Flores-Montano,* 541 U.S. at 155 n. 3 ("delays of one to two hours at international borders are to be expected"); *Tabbaa,* 509 F.3d at 99-101 (holding that a six-hour detention was "not . . . out of the realm of what is considered routine"); *Rahman v. Chertoff,* 2010 WL 1335434 at *2 (N.D. Ill. March 31, 2010) (holding that detentions ranging between two and six hours were routine, some of them involving fingerprints, photographs, wallet searches, and patdowns). Secondary inspection may include a routine standard patdown search of the traveler's person.

## PATDOWN SEARCHES

While the Supreme Court has been silent on what constitutes a routine search, various courts of appeals have determined that a standard patdown search is routine. *See Bradley v. United States (Bradley II),* 299 F.3d 197, 203 (3d Cir. 2002); *United States v. Beras,* 183 F.3d 22, 26 (1st Cir. 1999); *United States v. Gonzalez-Rincon,* 36 F.3d 859, 864 (9th Cir. 1994); *United States v. Carreon,* 872

F.2d 1436, 1442 (10th Cir. 1989). A routine standard patdown search involves a patdown of a person's body over that person's clothes, including the person's breast and crotch areas. *Anderson v. Cornejo,* 199 F.R.D. 228, 257 (N.D. Ill. 2000). Patting a person down in the breast and crotch area inherently involves a rubbing or pushing motion, and an officer in patting down a woman's crotch area to feel for bulges necessarily presses upon the external genitalia, including the inner and outer labia, through the woman's clothing. *Id.* at 258-59; *Bradley v. United States,* 164 F. Supp. 2d 437, 449 (D.N.J.), *aff'd* 299 F.3d 197 (3d Cir. 2002).

While routine searches at the border do not require any suspicion, non-routine searches at the nation's borders require reasonable suspicion. *Bradley II,* 299 F.3d at 203; *Beras,* 183 F.3d at 26; *Gonzalez-Rincon,* 36 F.3d at 864. Non-routine searches consist of strip searches, body cavity searches, and involuntary x-ray searches. *Montoya de Hernandez,* 473 U.S. at 541 n. 4. A strip search involves a visual inspection of the naked body without intrusion into the person's body cavities. *Wood v. Hancock Cnty Sheriff's Dep't,* 354 F.3d 57, 63 (1st Cir. 2003). A strip search may occur even when the person being searched is not fully disrobed, such as when a female is required to strip down to her bra and panties. *See Brannum v. Overton Cnty. Sch. Bd.,* 516 F.3d 489, 495 (6th Cir. 2008); *Wood,* 354 F.3d at 63 n. 10.

7

A patdown search, while generally a routine search, may be considered non-routine if it is intrusive enough. For example, a patdown search where the officer reaches under a person's clothes, "particularly in the breast and crotch area," or where the officer fondles "a [person's] genital area, breasts, or buttocks area during a patdown" is non-routine. *Anderson v. Cornejo,* 199 F.R.D. at 258; *see Bradley II,* 299 F.3d at 203-04 (acknowledging the possibility that "a patdown gone awry could become so intrusive as to become a non-routine search requiring application of the reasonable suspicion standard").

## QUALIFIED IMMUNITY

The doctrine of qualified immunity provides that government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Its applicability is determined, as a matter of law, by the trial judge. *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir. 1988).

Qualified immunity has been established by the Supreme Court as an "accommodation for reasonable error," not only shielding government officials who have acted properly, but providing judicial forgiveness for those officials who

have made mistakes. *Hunter v. Bryant,* 502 U.S. 224, 227, 229 (1991). Under the doctrine of qualified immunity, officials are immune unless "the law clearly proscribed the actions" they took. *Mitchell,* 472 U.S. at 428. "[I]f officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Qualified immunity gives "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter,* 502 U.S. at 229 (quoting *Davis v. Scherer,* 468 U.S. 183, 196 (1984)).

To determine whether an official is entitled to qualified immunity, a court must decide (1) whether a plaintiff's allegations make out a claim that the official's conduct violated a constitutional right; and (2) whether the right at issue was "clearly established at the time of the alleged misconduct." *Kennedy v. City of Villa Hills,* 635 F.3d 210, 213 (6th Cir. 2011). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Because *Pearson* retained the core analysis of *Saucier v. Katz,* 533 U.S. 194 (2001), pre-*Pearson* qualified immunity remains good law. *Aldini v. Johnson,* 609 F.3d 858, 863 (6th Cir. 2010).

For a constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987). Indeed, pre-existing law must "dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances." Graff v. Ky. Cabinet for Workforce Dev.,* 289 F.3d 958, 964 (6th Cir. 2002) (quoting *Saylor v. Bd. Of Ed. of Harlan Co.,* 188 F.3d 507, 515 (6th Cir. 1997) (emphasis in original)). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. at 202. The plaintiff bears that burden of showing the claimed right was clearly established. *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir. 2009).

                                              Respectfully submitted,

                                              Barbara L. McQuade
                                              United States Attorney

                                              */s/ Derri T. Thomas*
                                              Derri T. Thomas (P53439)
                                              Zak Toomey (MO 61618)
                                              Assistant United States Attorneys
                                              211 W. Fort Street, Suite 2001
                                              Detroit, Michigan  48226
                                              Phone:   (313) 226.9153
                                                          (313) 226.9617
                                              E-mail:   derri.thomas@usdoj.gov
Dated: May 29, 2015                                 zak.toomey@usdoj.gov

## **CERTIFICATION OF SERVICE**

I hereby certify that on May 29, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

>*s/DERRI T. THOMAS*
>Derri T. Thomas (P53439)
>Assistant United States Attorney
>211 W. Fort Street, Suite 2001
>Detroit, Michigan  48226
>Phone:  (313) 226-9153
>E-mail:  derri.thomas@usdoj.gov